**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

UNITED STATES OF AMERICA, *ex rel.* ROGELIO ESTRELLA,

Plaintiff-Relator,

v.

PAE AVIATION AND TECHNICAL SERVICES LLC,

Defendant.

Case No.:

**COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. §§ 3729, *et seq.***

**JURY TRIAL DEMANDED**

**FILED *IN CAMERA* AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

**TABLE OF CONTENTS**

**INTRODUCTION ........................................ 1**

**PARTIES ........................................ 5**

A. Relator Rogelio Estrella ........................................ 5

B. Defendant PAE Aviation and Technical Services LLC ........................................ 6

C. Relevant non-parties ........................................ 8

1. Larry Anaya ........................................ 8

2. William Cagle ........................................ 9

3. Daniel Casey ........................................ 9

4. Alan Dingman ........................................ 10

5. Gary Gunlock ........................................ 10

6. Todd Kamins ........................................ 10

7. Michael Phillips ........................................ 11

8. Matthew Rowley ........................................ 12

9. Stephen Sako ........................................ 12

10. Glen White ........................................ 12

11. Kevin Williams ........................................ 13

**JURISDICTION AND VENUE ........................................ 14**

**STATUTORY AND REGULATORY CONTEXT ........................................ 15**

A. The False Claims Act ........................................ 16

B. The Federal Acquisition Regulation ........................................ 18

**FACTUAL ALLEGATIONS ........................................ 19**

A. PAE's Government contracts and billing procedures ........................................ 19

B. Michael Ward's death at PAE ........................................ 26

C. Defendant's violations of the False Claims Act ........ 27

1. Fraudulent billing to the U.S. Navy: PAE regularly facilitates falsified and improperly accounted for project billing under its Government contracts. ........ 28

2. Fraudulent billing in connection with the work that led to Mr. Ward's death ........ 34

3. Fraudulent submissions to OSHA: PAE falsified training records supplied during OSHA's investigation of Mr. Ward's death in order to reduce penalties. ........ 40

**CAUSES OF ACTION ........ 48**

## INTRODUCTION

1. *Qui tam* Plaintiff–Relator Rogelio "Roy" Estrella ("Relator"), through his undersigned attorneys, hereby brings this action pursuant to the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA") on behalf of the United States of America against PAE Aviation and Technical Services LLC ("PAE" or the "Defendant"). Relator sues Defendant to recover treble damages, civil penalties, and all other appropriate relief on behalf of the United States for deceiving the United States Navy and other U.S. agencies. The claims asserted in this Complaint are based on the facts and information set forth below, and upon information and belief, unless otherwise stated.

2. Defendant PAE is a prominent military contractor, which contracts to provide maintenance and logistical services to the U.S. Department of Defense, and with relevance to the subject of this Complaint, the U.S. Navy. PAE's support services include maintaining and repairing ships, and providing instruction and training for U.S. Navy personnel.

3. PAE has perpetrated multiple frauds harming the Government, including (1) fraudulent billing for work, including work not performed, i.e., presenting false claims for payment; (2) failing to uphold the terms of a contract by, *inter alia*, using unqualified personnel; and (3) providing false documentation during an Occupational Safety and Health Administration ("OSHA") investigation of a death in the workplace to avoid penalties and fines.

4. For years and upon information and belief, staff at PAE's Coronado, California location knowingly and regularly instructed employees to submit and did

submit false and fraudulent claims for payment to the United States, by falsely billing under specific time codes for work those same employees did not actually perform.

5. Relator is a retired First-Class Petty Officer of the U.S. Navy, who after decades of service and an honorable discharge, worked for PAE for more than three years. During his employment, Mr. Estrella gained personal knowledge of the fraudulent billing practices. PAE employees directed Mr. Estrella to log time for work he did not perform, and to use billing codes which did not accurately reflect the work performed. According to Mr. Estrella, such fraud was widely known to occur at PAE. Multiple PAE employees have testified under oath in other litigation that false billing practices occurred at PAE's Coronado, California location.

6. Another fraud uncovered by Relator involves the tragic death of former PAE employee Michael Ward, who died on a commercial dive for PAE. Industrial diving is a notoriously hazardous job, for which PAE sent Mr. Ward into the water without proper training. During the dive, Mr. Ward never resurfaced from the water, and was found unresponsive on the ocean floor. PAE crew did not bring proper rescue aids or devices necessary to hoist a diver onboard the vessel, and Mr. Ward was dragged back to shore alongside the boat. He did not survive the dive. OSHA cited and fined PAE following an investigation.

7. PAE fraudulently charged the Government for work performed by an underqualified and unprepared personnel, breaching the terms of its Government contract and costing Mr. Ward his life. PAE saw fit to benefit following the negligent

tragedy: Mr. Ward's timesheets indicate that PAE recorded Mr. Ward as having worked a full eight hours on the day of his death—an impossibility due to his demise.

8. Finally, facing an OSHA investigation following Mr. Ward's death, PAE fabricated and submitted falsified documents to avoid the serious fines that would have been levied—and *should* have been levied—for its role in Mr. Ward's death.

9. To date, PAE has avoided due penalty for its acts of fraud upon the Government, including those causing and following Mr. Ward's death.

10. These FCA violations reflect a larger culture of dishonesty and fraud. PAE is a well-known government contractor that has received more than $3 *billion* in government contracts, but it and its affiliates regularly engage in unlawful behavior. The fraud disclosed by Relator is part of a resurfacing pattern and practice of fraud committed by PAE in the United States and around the world. That pattern involves, *inter alia*, a $4.2 million settlement to resolve allegations of submitting false claims to the U.S. Air Force for employee wages;[1] a $5 million settlement to resolve allegations of knowingly failing to adhere to vetting requirements for personnel in Afghanistan subject to a U.S. Department of State contract;[2] a $1.45 million

---

[1] *Defense Contractor Agrees to Pay $4,200,000 to Settle Allegations of Submitting False Claims to The United States Air Force*, U.S. Dep't of Justice (June 28, 2019), https://www.justice.gov/usao-wdok/pr/defense-contractor-agrees-pay-4200000-settle-allegations-submitting-false-claims-united (last visited Dec. 18, 2023).

[2] *Pacific Architects and Engineers, LLC to Pay $5 Million In False Claims Act Settlement*, U.S. Dep't of Justice (Sept. 13, 2017), https://www.justice.gov/usao-dc/pr/pacific-architects-and-engineers-llc-pay-5-million-false-claims-act-settlement (last visited Dec. 18, 2023).

settlement to resolve allegations of engaging in bid-rigging resulting in false claims for payment under a U.S. Army contract;[3] multiple False Claims Act lawsuits;[4] and multiple Inspector General audits which found unallowable costs billed to United State Government.[5]

11. False billing causes harm to the Government in numerous ways. In addition to the obvious harm of submitting invoices for work not performed, false billing detracts from the Government's ability to accurately budget and predict expenses.

12. PAE has been unfairly enriched by its fraudulent conduct, while the United States Government has been harmed.

---

[3] *PAE Government Services and RM Asia (HK) Limited to Pay $1.45 Million to Settle Claims in Alleged Bid-Rigging Scheme*, U.S. Dep't of Justice (Sept. 11, 2015), https://www.justice.gov/opa/pr/pae-government-services-and-rm-asia-hk-limited-pay-145-million-settle-claims-alleged-bid (last visited Dec. 18, 2023).

[4] *See, e.g.*, *United States ex rel. Garzione v. PAE Gov't Servs., Inc.*, 164 F. Supp. 3d 806, 812 (E.D. Va.), *aff'd*, 670 F. App'x 126 (4th Cir. 2016); *United States ex rel. Scott v. Pac. Architects & Engineers (PAE), Inc.*, 270 F. Supp. 3d 146, 153 (D.D.C. 2017) (finding that relators plausibly stated False Claims Act violation against PAE for false time billing to the Government; claim later dismissed under public disclosure bar, 2020 WL 224504 (D.D.C. Jan. 15, 2020)).

[5] *See, e.g.*, *Audit of Pacific Architects and Engineers, Inc., FY 2011 Incurred Cost Proposal for the CIVPOL, AFRICAP I, AFRICAP II, and Embassy Baghdad Contracts*, Office of Inspector General (Aug. 2017), https://www.stateoig.gov/report/aud-cgi-17-52; *Department of State's Afghanistan Justice Sector Support Program: Audit of Costs Incurred by Pacific Architects and Engineers, Inc.*, Special Inspector General for Afghanistan Reconstruction (Dec. 2014), https://www.oversight.gov/sites/default/files/oig-reports/SIGAR-15-22-FA.pdf.

## PARTIES

### A. Relator Rogelio Estrella

13. Relator Rogelio "Roy" Estrella is a United States citizen residing in the United States and former employee of Defendant PAE's Coronado, California location, having worked there from November 2017 until his resignation in March 2021. Relator was a friend and colleague of decedent Mr. Ward.

14. Relator was employed at all relevant times at Defendant PAE, and worked closely with the relevant non-parties listed below.

15. Prior to working at PAE, Relator served for 20 years and was honorably discharged from the U.S. Navy, having attained the rank of First-Class Petty Officer (E-6), and having served as a Craftmaster (boat captain).

16. While at PAE, Relator held the position of Engineering Technician IV, serving as a U.S. Navy deck instructor, and instructing individuals in boat operation and training crews in the construction and maintenance of Improved Navy Lighterage Systems ("INLS"). INLS are approximately 300-foot floating causeways or landing crafts constructed and maintained for the purpose of transferring cargo from ship to shore (or shore to ship) where conventional docking facilities might be unavailable. Relator secondarily worked in the "deckside" maintenance of these systems.

17. During the course of his employment, Relator gained personal knowledge of fraudulent practices at PAE, specifically, pervasive fraudulent billing under Government contracts and falsification and submission of documents to a government investigator.

18. Relator resigned from PAE, in part, due to concerns surrounding safety protocols and OSHA violations, and due to accumulated discomfort with lawbreaking by PAE staff.

19. After departing PAE and until November 2021, Relator worked as a Small Craft Operator for another Government contractor in California. While at that contractor, Relator did not observe any of the fraudulent behaviors he had witnessed at PAE, and felt that in contrast to his time at PAE, there was complete transparency regarding contract obligations and the relevant statement of work. Relator now lives in Fort Worth, Texas.

**B. Defendant PAE Aviation and Technical Services LLC**

20. Defendant PAE Aviation and Technical Services LLC was and is a company organized and existing according to the laws of the State of Delaware,[6] with its principal place of business in Marlton, New Jersey.[7]

---

[6] *See PAE Aviation and Technical Services LLC*, Dep't of State: Division of Corporations, State of Delaware, *available at* https://icis.corp.delaware.gov/Ecorp/EntitySearch/NameSearch.aspx (last visited Dec. 18, 2023) (containing incorporation and Wilmington, Delaware registered agent information for PAE Aviation and Technical Services LLC, file number 3772480); *see also PAE Company Exhibit*, Sec. & Exch. Comm'n, *available at* https://www.sec.gov/Archives/edgar/data/1720821/000119312520038383/d793154dex211.htm (last visited Dec. 18, 2023) (listing PAE affiliates and places of formation).

[7] *See PAE Aviation and Technical Services LLC*, Cal. Sec'y of State, *available at* https://bizfileonline.sos.ca.gov/search/business (last visited Dec. 18, 2023) (containing incorporation and California registered agent information for PAE Aviation and Technical Services LLC, file number 200419710161).

21. During the majority of the relevant time frame, PAE was "an indirect wholly owned subsidiary of" the former publicly-traded company, PAE Incorporated.[8]

22. In February 2022, PAE Incorporated was acquired by Amentum, which is a privately-held Government contractor.[9]

23. PAE Incorporated and its subsidiaries are historically well-known Government contractors, and according to a U.S. Securities and Exchange Commission filing, PAE Incorporated "is a leading, highly diversified, global company that *provides a broad range of operational solutions and outsourced services to meet the critical enduring needs of the U.S. Government* [and] other allied governments."[10]

24. PAE Incorporated's SEC filings provide that:

> PAE was founded in 1955 as an architecture and engineering firm to provide facility design and construction supervision services to the U.S. Army Corps of Engineers, Navy and Air Force based in Asia. PAE became one of the largest providers of diverse contract services to the U.S. Army during the Vietnam War era and employed thousands of personnel overseas.[11]

---

[8] *See* PAE Inc., Annual Report (Form 10-K/A) at 111 (May 7, 2021), *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/1720821/000172082121000075/pae-20201231.htm.

[9] *See Amentum Completes Acquisition of PAE*, Amentum (Feb. 15, 2022), https://www.amentum.com/amentum-completes-acquisition-of-pae/; *see also Corporate Lineage*, Amentum, https://www.amentum.com/corporate-lineage/ (last visited Dec. 18, 2023).

[10] PAE, Inc., Quarterly Report (Form 10-Q) at 28 (Nov. 4, 2021), *available at* https://www.sec.gov/Archives/edgar/data/1720821/000172082121000096/pae-20210926.htm (emphasis added).

[11] PAE, Inc., Annual Report (Form 10-K) at 13 (Mar. 16, 2021), *available at* https://www.annualreports.com/HostedData/AnnualReports/PDF/NASDAQ_PAE_2020.pdf.

### C. Relevant non-parties

25. The following relevant non-parties[12] knowingly facilitated and caused fraud on the Government as stated herein, or have knowledge of the relevant events. Relator has firsthand knowledge of the roles the relevant non-parties played, if any, in knowingly presenting false training records to Government investigators, instructing employees to track their time under false time codes, and, in contravention of contract requirements, utilizing unqualified personnel to perform work that was then billed to the Government.

#### 1. Larry Anaya

26. Larry Anaya was an employee of PAE from 2005 to 2020, beginning as an Engineering Technician I, and eventually being promoted up to an Engineering Technician IV.[13] He worked closely with many PAE employees involved in the diving program, including Stephen Sako and Alan Dingman, and viewed Mr. Ward's dive training as insufficient.[14]

---

[12] Details surrounding the relevant non-parties' current employment are included to the best of available knowledge, based on Relator Estrella's knowledge as of his departure from PAE and upon the research of undersigned counsel.

[13] Deposition of Larry Anaya ("Anaya Dep."), *Autumn Ward v. Pacific Architects & Engineers, LLC, et al.*, No. 3:21-cv-0305, ECF No. 71-10, at 2 (S.D. Cal. Mar. 21, 2023).

All pin cites (e.g., page numbers) referenced in citations to other electronically filed court documents throughout this Complaint use the ECF docket stamped page number. For example, if the docket stamp says "Page 11 of 39," the pin cite is 11.

[14] *Id.* at 28.

**2. William Cagle**

27. William Cagle serves in the Navy and works as a Program Manager for the Naval Air Warfare Center Training Systems Division in Orlando, Florida.[15] In 2019, Mr. Cagle assumed a Program Manager position for the relevant contract between PAE and the Government.[16] As Program Manager he provided oversight and management of contract activities, ensured that the contract was adhered to, and further managed the Contracting Officer Representative.[17]

28. Mr. Cagle is knowledgeable about PAE's billing practices.

**3. Daniel Casey**

29. Daniel Casey was an employee of PAE or its predecessors from 2007 through approximately 2020, serving as an Engineering Technician IV and the Course Curriculum Manager.[18] Mr. Casey was instructed by Mr. Sako to drive the rigid-hulled inflatable boat ("RHIB") for the dive on the date of Mr. Ward's death.[19]

---

[15] Deposition of William Russ Cagle ("Cagle Dep."), *Autumn Ward v. Pacific Architects & Engineers, LLC, et al.*, No. 3:21-cv-0305, ECF No. 71-11, at 2 (S.D. Cal. Mar. 31, 2023).

[16] *Id.* at 3–4.

[17] *Id.* at 4–5, 13.

[18] Deposition of Daniel Casey ("Casey Dep."), *Autumn Ward v. Pacific Architects & Engineers, LLC, et al.*, No. 3:21-cv-0305, ECF No. 71-12, at 14 (S.D. Cal. Mar. 31, 2023).

[19] *Id.* at 31.

**4. Alan Dingman**

30. Alan Dingman works as an Engineering Technician IV at PAE in Coronado, California. At PAE, Mr. Dingman instructs U.S. Navy personnel and PAE employees, and performs maintenance.

31. Mr. Dingman has worked at PAE for nearly two decades, and was present during the operation that led to Mr. Ward's death. As with Mr. Sako, Mr. Dingman performed collateral duty maintenance dives at PAE until Mr. Ward's death, after which, upon information and belief, he was no longer comfortable diving.

**5. Gary Gunlock**

32. Gary Gunlock was hired by PAE in 2016, to succeed Glen White upon his retirement.[20] Mr. Gunlock served as the relevant contract Site Manager from March 1, 2019 through at least July 6, 2023.[21] As Site Manager, he is PAE's point person for its contract with the U.S. Navy. He was the relevant contract Operations Manager from 2017 through February 28, 2019.[22]

**6. Todd Kamins**

33. Todd Kamins serves as the Executive Officer of Naval Support Activity Charleston. From approximately September 2017 to December 2019, Mr. Kamins

---

[20] Deposition of Gary Gunlock ("Gunlock Dep."), *Autumn Ward v. Pacific Architects & Engineers, LLC, et al.*, No. 3:21-cv-0305, ECF No. 71-15, at 10 (S.D. Cal. Mar. 31, 2023).

[21] Declaration of Gary Gunlock ("Gunlock Decl."), *Autumn Ward v. Pacific Architects & Engineers, LLC, et al.*, No. 3:21-cv-0305, ECF No. 70-2, at 2 (S.D. Cal. Mar. 31, 2023).

[22] *Id.* at 2.

served as Deputy Director of Navy Training at the Expeditionary Workload Training Group Pacific ("EWTGPAC"), and his duties included liaising with PAE on behalf of the Navy.[23] In addition, he served as the Contracting Officer's Representative as collateral duty, which required him to read the Government contract held by PAE.[24]

34. While at EWTGPAC, Mr. Kamins professionally interfaced with PAE employees Glen White and Gary Gunlock, who at the time were the PAE Program Manager and Operations Officer, respectively.[25]

**7. Michael Phillips**

35. Michael Phillips is an employee of PAE, working as an Engineering Technician IV in the Deck Department since 2016.[26] In his capacity, he worked closely with Mr. Ward.

36. Relevant to the proceedings at hand, he was aware of PAE employees falsifying documents submitted to OSHA.[27]

---

[23] Deposition of Todd Kamins ("Kamins Dep."), *Autumn Ward v. Pacific Architects & Engineers, LLC, et al.*, No. 3:21-cv-0305, ECF No. 71-17, at 4–5 (S.D. Cal. Mar. 31, 2023).

[24] *Id.* at 7.

[25] *Id.* at 6.

[26] Deposition of Michael Phillips ("Phillips Dep. I"), *Autumn Ward v. Pacific Architects & Engineers, LLC, et al.*, No. 3:21-cv-0305, ECF No. 71-19, at 3, 7 (S.D. Cal. Mar. 31, 2023).

[27] *Id.* at 19–20.

**8. Matthew Rowley**

37. Matthew Rowley works as an Operations Manager at PAE in Coronado, California, a position he has held since March of 2019.[28] As part of his duties as Operations Manager, he has scheduled courses and projects, checked time sheets, managed employees' schedules, and provided input for billing.[29] Prior to his time as Operations Manager, he served as an instructor and assistant chief engineer.[30]

**9. Stephen Sako**

38. Stephen Sako works as an Engineering Technician IV at PAE in Coronado, California.

39. At PAE, Mr. Sako instructs U.S. Navy personnel. Mr. Sako led the voluntary diver program at PAE, and periodically performed maintenance dives at PAE until Mr. Ward's death. Mr. Sako has worked at PAE for over two decades, and was present during the operation that led to Mr. Ward's death.

**10. Glen White**

40. Glen White served as the Program Manager of PAE until 2019. In his capacity, he was effectively a site manager who oversaw PAE's activities, including its voluntary dive program. His "main job was to ensure that the [government] contract was executed in accordance with the government's requirements," and he

---

[28] Deposition of Matt Rowley ("Rowley Dep. I"), *Autumn Ward v. Pacific Architects & Engineers, LLC, et al.*, No. 3:21-cv-0305, ECF No. 71-20, at 2–3 (S.D. Cal. Mar. 31, 2023).

[29] *Id.*

[30] *Id.* at 3–4.

interfaced with corporate PAE personnel and the Government.[31] Mr. White was knowledgeable about PAE's billing code practices,[32] particularly how PAE billed the U.S. Government.[33] He is retired from PAE.[34]

**11. Kevin Williams**

41. Kevin Williams is an employee of PAE and has served as the Deck Supervisor in Coronado, California for over five years.[35] In his capacity, he oversees the Deck Department's activities, which includes instructing courses to Navy personnel and maintaining watercrafts.[36] He has worked at PAE for over 18 years.[37]

---

[31] Deposition of Glen White ("White Dep. I"), *Autumn Ward v. Pacific Architects & Engineers, LLC, et al.*, No. 3:21-cv-0305, ECF No. 71-23, at 7–8 (S.D. Cal. Mar. 31, 2023).

[32] Deposition of Glen White ("White Dep. II"), *Autumn Ward v. Pacific Architects & Engineers, LLC, et al.*, No. 3:21-cv-0305, ECF No. 71-22, at 34 (S.D. Cal. Mar. 31, 2023).

[33] Deposition of Glen White ("White Dep. III"), *Autumn Ward v. Pacific Architects & Engineers, LLC, et al.*, No. 3:21-cv-0305, ECF No. 75-14, at 7–8 (S.D. Cal. Apr. 28, 2023).

[34] White Dep. I at 7.

[35] Deposition of Kevin Williams ("Williams Dep."), *Autumn Ward v. Pacific Architects & Engineers, LLC, et al.*, No. 3:21-cv-0305, ECF No. 71-24, at 2 (S.D. Cal. Mar. 31, 2023).

[36] *Id.* at 2–3.

[37] *Id.* at 5.

## JURISDICTION AND VENUE

42. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1345 because this action involves a federal question and the United States is a plaintiff. This Court also has subject matter jurisdiction under 31 U.S.C. § 3732(a).

43. The Court may exercise personal jurisdiction over Defendant under 31 U.S.C. § 3732(a) because Defendant PAE can be found in and transacts business within this District, because Defendant resides in and has numerous contacts with the United States, and because 31 U.S.C. § 3732(a) authorizes nationwide and worldwide service of process. Defendant PAE has been registered in this District since its incorporation in 2004.[38]

44. Venue is proper in this District under 31 U.S.C. § 3732(a) because Defendant PAE is incorporated in and transacts business within this District. Venue is also proper under 28 U.S.C. § 1391(b).

45. This Complaint is not based on a public disclosure as defined in 31 U.S.C. § 3730(e). Relator sues as the original source of information regarding Defendant's violations of the FCA, given that Relator has direct and independent knowledge of the information on which the allegations are based and/or knowledge that is independent of and materially adds to any allegations or transactions that

---

[38] *See PAE Aviation and Technical Services LLC*, Dep't of State: Division of Corporations, State of Delaware, *available at* https://icis.corp.delaware.gov/Ecorp/EntitySearch/NameSearch.aspx (last visited Dec. 19, 2023) (containing incorporation and Wilmington, Delaware registered agent information for PAE Aviation and Technical Services LLC, file number 3772480).

may have been publicly disclosed (although Relator knows of no such public disclosure).

46. No allegation in this Complaint is based on a public disclosure of allegations or transactions in a federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation; or from the news media. Rather, Relator is the original source under 31 U.S.C. § 3730(e)(4).

## STATUTORY AND REGULATORY CONTEXT

47. In its securities filings, PAE Incorporated acknowledged a variety of laws it was subject to as a Government contractor:

> The services PAE provides to the U.S. Government are subject to the Federal Acquisition Regulation ("FAR") and agency FAR supplements, the Truthful Cost or Pricing Data requirements (commonly referred to as the "Truth in Negotiations Act"), the U.S. Government Cost Accounting Standards ("CAS"), the Service Contract Act ("SCA"), the False Claims Act ("FCA"), the Foreign Corrupt Practices Act ("FCPA"), export control requirements, agency security regulations, federal employment laws and regulations (including equal opportunity and affirmative action requirements), as well as many other laws and regulations.[39]

48. PAE Incorporated also acknowledged that specific consequences, such as contract termination, can result from a violation of these laws.[40] Relevant

---

[39] PAE Inc., Annual Report (Form 10-K/A) at 10–11 (May 7, 2021), *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/1720821/000172082121000075/pae-20201231.htm.

[40] PAE Inc., Annual Report (Form 10-K/A) at 11 (May 7, 2021), *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/1720821/000172082121000075/pae

authorities implicated here include the False Claims Act and the Federal Acquisition Regulation.

49. These authorities ensure not only that public dollars are being used responsibly, but also that the nation's defense institutions are working with trustworthy contractors.

**A. The False Claims Act**

50. The FCA makes it unlawful for any person to submit, directly or indirectly, false or fraudulent claims for payment to the Government. *See* 31 U.S.C. § 3729, *et seq*. Originally enacted in 1863, the FCA was substantially amended in 1986 by the False Claims Amendments Act. The 1986 amendments enhanced the Government's ability to recover losses sustained because of fraud against the United States. Relator alleges liability primarily under numerous of the FCA's seven liability provisions.

51. First, the FCA's "presentment" provision, 31 U.S.C. § 3729(a)(1)(A), imposes liability when a defendant (a) made, or caused to be made, a claim, (b) that was false or fraudulent, (c) while knowing of its falsity.

52. Second, the FCA's "false records or statements" provision, 31 U.S.C. § 3729(a)(1)(B), imposes liability when a defendant (a) made, used, or caused to be made or used, a record or statement, (b) that was knowingly false, and (c) that was material to a false or fraudulent claim.

---

-20201231.htm ("A violation of specific laws and regulations could lead to fines, contract termination or suspension of future contracts.").

53. Third, the FCA's "conspiracy" provision, 31 U.S.C. § 3729(a)(1)(C), imposes liability when a defendant conspires to commit a violation of the FCA.

54. Fourth, the FCA's "reverse false claims" provision, 31 U.S.C. § 3729(a)(1)(G), imposes liability when a defendant (a) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the United States; or (b) knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money to the United States.

55. The "knowledge" element of the FCA is defined as (1) "actual knowledge of the [falsity of the] information"; (2) "deliberate ignorance of the truth or falsity of the information"; or (3) "reckless disregard of the truth or falsity of the information" provided to the Government. 31 U.S.C. § 3729(b)(1)(A). No specific intent to defraud need be shown. 31 U.S.C. § 3729(b)(1)(B).

56. Under the FCA, the term "claim" means any request or demand for money, whether under a contract or otherwise, presented to an officer, employee, or agent of the United States. 31 U.S.C. § 3729(b)(2)(A)(i). A "claim" is also a request or demand for money made to a contractor or other recipient if (a) the money is to be spent or used on the Government's behalf or to advance a Government program or interest and (b) if the Government provides, has provided, or will reimburse such contractor or other recipient for any portion of the money requested or demanded. 31 U.S.C. § 3729(b)(2)(A)(ii).

57. The FCA defines "material" objectively to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money

or property." 31 U.S.C. § 3729(b)(4). The Supreme Court reaffirmed the natural tendency materiality test—even as to subsection (a)(1)(A), which does not explicitly use the term—and described a holistic approach to analyzing it. *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 181 (2016).

58. The FCA empowers private persons who have information regarding a false or fraudulent claim against the Government to sue on the Government's behalf and to share in any recovery. 31 U.S.C. § 3730(b).

**B. The Federal Acquisition Regulation**

59. PAE, in its annual reports, acknowledges that the Federal Acquisition Regulation ("FAR")—codified at 48 C.F.R. chapter 1—"sets forth policies, procedures and requirements for the acquisition of goods and services by the U.S. Government."[41]

60. Reporting of hours worked under a Government contract is governed by the FAR. In particular, the FAR sets forth timekeeping requirements for Government contractors and governs what is chargeable.

61. For example, a cost related to contract performance is "only" allowable if it is "reasonable" *and* complies with the "[t]erms of the contract." FAR § 31.201-2(a). The FAR also imposes strict accounting principles on contractors, and where "accounting practices are inconsistent … costs resulting from such inconsistent

[41] *See* PAE Inc., Annual Report (Form 10-K/A) at 11 (May 7, 2021), *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/1720821/000172082121000075/pae-20201231.htm.

practices in excess of the amount that would have resulted from using practices consistent with [FAR subpart 31.2] are unallowable." FAR § 31.201-2(c).

62. As part of those accounting duties, contractors are "responsible for accounting for costs appropriately and for maintaining records, including supporting documentation, adequate to demonstrate that costs claimed have been incurred, are allocable to the contract, and comply with applicable cost principles." FAR § 31.201-2(d).

63. In addition, any compensation for labor or personal services "must be reasonable for the work performed" and "must be based upon and conform to the terms and conditions of the contractor's established compensation plan or practice followed so consistently as to imply, in effect, an agreement to make the payment." FAR § 31.205-3, 6.

64. In summary, provisions of the Government contracts at issue here and applicable Federal Acquisition Regulation provisions required PAE to honestly and accurately report time billing and labor hours.

## FACTUAL ALLEGATIONS

### A. PAE's Government contracts and billing procedures

65. PAE contracts with the United States to assist with cargo offloading ships and systems. At issue here is work billed pursuant to PAE's contracts with the Department of Defense to provide instruction, maintenance, and operations for the U.S. Navy. At any given time, it is vital for the U.S. military to be able to transfer large cargo from ship to shore, and shore to ship. PAE staff assist with training U.S.

Navy personnel in such systems and operations. This requires significant engineering and operations expertise.

66. PAE and its related entities have been awarded Government contracts valued at approximately $3.4 billion.[42] Over 20 percent of that value, or roughly $779 million, is attributable to contracts with the U.S. Navy.[43]

67. The specific contracts relevant to the fraud alleged herein are worth tens of millions of dollars.

68. The relevant location of PAE for this case is in Coronado, California. In Coronado, PAE is located inside the building of a Naval Amphibious Base of a U.S. Navy command called Expeditionary Warfare Training Group, Pacific.[44] EWTGPAC is "responsible for providing instruction in the tactics, techniques, and doctrine of expeditionary warfare to US forces."[45]

69. From 2013 through the present, PAE operated under at least two relevant and consecutively awarded contracts to "provide contractor instruction,

---

[42] *See Recipient Profile: PAE Aviation and Technical Services LLC*, USAspending, https://www.usaspending.gov/recipient/8918c619-7c89-2317-7222-029df0cd8599-C/all (last visited Dec. 19, 2023).

[43] *See id.* (last visited Dec. 19, 2023).

[44] *See* Gunlock Decl. at 2.

[45] *Id.*

maintenance, operation and training support for the strategic sealift cargo off-load and discharge system (COLDS)."[46]

70. The first COLDS contract (contract number N61340-14-D-0001)[47] was in place from January 1, 2014 through December 2018. PAE received over $24 million under the contract,[48] which contains multiple provisions that mandated certain performance requirements of PAE.[49]

71. The second COLDS contract (contract number N61340-19-D-1020)[50] has been in effect since February 2019. Its Statement of Work terms are nearly identical to the 2013 COLDS Contract.[51]

---

[46] *See Award Profile for Contract No. N6134014D0001*, USAspending, https://www.usaspending.gov/award/CONT_IDV_N6134014D0001_9700 (last visited Dec. 19, 2023); *Award Profile for Contract No. N6134019D1020*, USAspending, https://www.usaspending.gov/award/CONT_IDV_N6134019D1020_9700 (last visited Dec. 19, 2023).

[47] *See Award Profile for Contract No. N6134014D0001*, USAspending, https://www.usaspending.gov/award/CONT_IDV_N6134014D0001_9700 (last visited Dec. 19, 2023).

[48] *See Award Profile for Contract No. N6134014D0001*, USAspending, https://www.usaspending.gov/award/CONT_IDV_N6134014D0001_9700 (last visited Dec. 19, 2023).

[49] *See generally* Solicitation, Offer and Award for Contract No. N61340-14-D-0001 ("2013 COLDS Contract"), *Autumn Ward v. Pacific Architects & Engineers, LLC, et al.*, No. 3:21-cv-0305, ECF No. 70-3 (S.D. Cal. Mar. 31, 2023).

[50] *Award Profile for Contract No. N6134019D1020*, USAspending, https://www.usaspending.gov/award/CONT_IDV_N6134019D1020_9700 (last visited Dec. 19, 2023).

[51] *See* Performance Work Statement (PWS) for Contractor Instruction, Maintenance, Operation and Training Support (CIMOTS) for Training on the

72. PAE's contracts set forth detailed contracting requirements for PAE, including provisions surrounding timekeeping, payment processes, and personnel qualifications.

73. Relevant terms of the 2013 COLDS Contract, for example, are as follows:

- PAE used a system called Wide Area WorkFlow "to electronically process vendor payment requests."[52]

- In order to receive payment, PAE was required to "ensure a payment request includes appropriate contract line item and subline item descriptions of the work performed … and all relevant back-up documentation … (e.g. timesheets)."[53]

- Disbursements of funds were based on billing code designations as delineated by contract line-item number, subline item number, and the accounting classification references number.[54]

74. Relevant terms of the Statement of Work, which sets forth the work to be performed under the 2013 COLDS Contract, are as follows:[55]

---

Strategic Sealift Cargo Offload and Discharge Systems (COLDS) and Other Equipment/Systems, and Subsystems as Required ("2018 Performance Work Statement"), *Autumn Ward v. Pacific Architects & Engineers, LLC, et al.*, No. 3:21-cv-0305, ECF No. 71-35 (S.D. Cal. Mar. 31, 2023).

[52] *See* 2013 COLDS Contract at 140.

[53] *See id.* at 141 (incorporating by reference the Defense Federal Acquisition Regulation Supplement ("DFARS") to the Federal Acquisition Regulation, Appendix F).

[54] *See id.* at 143.

[55] Substantively identical terms can be found in the equivalent Statement of Work for the later 2019 COLDS Contract. *See* 2018 Performance Work Statement.

- PAE "personnel shall be certified and qualified to instruct the courses" led under the contract.[56]

- PAE personnel "shall conform to all safety, security and work condition regulations and procedures, which may be in effect during the contract period."[57]

- PAE "shall be responsible for providing competent, qualified personnel necessary to perform its responsibilities hereunder, and as further described hereafter."[58]

75. To bill the Government, PAE sent "Receiving Reports" for approval, which included work performed by contract line-item number ("CLIN") and amount of money to be billed.[59]

76. Staff on-site at PAE "cho[]se what CLIN to charge things to."[60] The contracts are firm-fixed-price contracts, and billed hourly.[61] Bidders for the contract broke down CLINs by hours, and based on the bid, "the government either approves those or, … through negotiations … move[s] them around a little bit."[62]

---

[56] *See* Statement of Work for Contractor Instruction, Maintenance, Operation and Training Support (CIMOTS) for Training on the Strategic Sealift Cargo Offload and Discharge Systems (COLDS) and Other Equipment/Systems, and Subsystems as Required ("Statement of Work"), *Autumn Ward v. Pacific Architects & Engineers, LLC, et al.*, No. 3:21-cv-0305, ECF No. 70-5, at 20 (S.D. Cal. Mar. 31, 2023).

[57] *See id.* at 25.

[58] *See id.* at 26.

[59] *See, e.g.*, Receiving Report, *Autumn Ward v. Pacific Architects & Engineers, LLC, et al.*, No. 3:21-cv-0305, ECF No. 70-11 (S.D. Cal. Mar. 31, 2023).

[60] White Dep. II at 33.

[61] *See* White Dep. III at 7.

[62] *See id.* at 8.

77. Upon information and belief, these "Receiving Reports" were reviewed by Todd Kamins. According to Mr. Kamins, "[t]he contracting officer owns the contract," and he operated as "that person's [local] representative."[63] Mr. Kamins was tasked with conducting quality assurance within the scope of the relevant Contract.

78. Various tasks were billed to the Government under CLINs, which appear in the Statement of Work. For example, the August 2018 dive that led to Mr. Ward's death was reportedly "billed to the government under COLDS Contract Line Item Number ('CLIN') 1842 for INLS Operation and Maintenance"—an invoice which the Government paid.[64]

79. Below is an example of an invoice:[65]

[63] *See* Kamins Dep. at 7; *see also id.* at 35 (noting that the Contracting Officer was Joe Livitor during the relevant time period).

[64] Gunlock Decl. at 5–6.

[65] PAE Invoice, *Autumn Ward v. Pacific Architects & Engineers, LLC, et al.,* No. 3:21-cv-0305, ECF No. 70-10 (S.D. Cal. Mar. 31, 2023).

**PAE**

**GL USD Master**

Billing Number: DSS0235
Invoice Number: 6000261894
Invoice Date: 09/06/2018

Description: CLIN 184204 ACRN AG

Bill To:
DFAS
DFAS - Columbus Center
North Entitlement Operations
PO Box 182266
Columbus, OH 43218-2266
United States of America

Remit To:
PAE Aviation & Technical Svcs LLC
901 Lincoln Drive West
Suite 200
Marlton, NJ 08053-3131
United States of America

Customer Number: 600007
Prime Contract Number: N61340-14-D-0001
Subcontractor Number:

| | Contract Value | Funded Value |
|---|---|---|
| Cost: | [redacted] | [redacted] |
| Fee: | | |
| Total: | | |

Cumulative Amount Billed: [redacted]

Project Number: 601093.04.FP00.00.001842
Project Name: INLS Ops and Maint
Project POP: 01/01/2018 to 12/31/2018
Terms: NET 30
Due Date: 10/04/2018
VAT/Tax ID Number:

Billing Period From: 08/01/2018 To: 08/31/2018
Billing Currency: USD

| | Current Amount | Cumulative Amount |
|---|---|---|
| Prev Bill From Sched | | |
| INLS Ops and Maint | [redacted] | [redacted] |
| BILL SCHEDULE ITEMS | | |
| Invoice Total | [redacted] | [redacted] |

Current Incurred Hours: 0.00
Cumulative Incurred Hours: 0.00

80. When a task was required of PAE that fell outside of the scope of the Statement of Work, PAE could submit an item called an "over and above" work request to charge the Government.[66]

81. PAE also kept more granular internal records of work performed, referred to as "Work Breakdown Structures." Upon information and belief, these Work Breakdown Structures were not forwarded to the Government, and exist as internal PAE records that are material to false or fraudulent claims.

---

[66] *See, e.g.*, Kamins Dep. at 31.

82. Since early 2019, William Cagle has served as the Program Manager to PAE for the U.S. Navy regarding the second COLDS Contract, and was charged with oversight and ensuring PAE operated within the confines of the contract.

**B. Michael Ward's death at PAE**

83. Mr. Ward—who previously served in the U.S. Navy—was employed as an engineering technician with PAE from December 2016 to August 2018. Prior to his death, he had received promotions, earning the position of Engineering Technician IV. He died on August 22, 2018 off the coast of Coronado, California, during the course of his employment on a dive to mark a lost "rode line" (i.e., a particular type of rope that connects an anchor to a vessel, floating causeway, or device).

84. Mr. Ward possessed a reputation at PAE for being "motivated," a "hard worker," and "honest."[67]

85. Mr. Ward's widow, Autumn Ward, serves as the personal representative of Mr. Ward's estate. She sued PAE and its affiliates in an action for the wrongful death of her husband.[68]

86. The complaint for wrongful death alleged numerous errors made by PAE during the course of Mr. Ward's dive. Unable to adequately see during his first dive, Mr. Ward surfaced to ask the PAE employees aboard the boat for a flashlight. He was

---

[67] *See* White Dep. I at 6.

[68] *See* Compl., *Autumn Ward v. Pacific Architects & Engineers, LLC, et al.*, No. 3:21-cv-0305, ECF No. 1 (S.D. Cal. Feb. 19, 2021).

denied one, and then went back under water. Mr. Ward never resurfaced, and was found unresponsive on the ocean floor. PAE crew did not bring proper rescue aids or devices necessary to hoist a diver onboard the vessel, and Mr. Ward was dragged back to shore alongside the boat. Approximately one hour later, on the shore, Mr. Ward was pronounced dead.

87. The wrongful death case has settled.[69]

**C. Defendant's violations of the False Claims Act**

88. There are three overarching False Claims Act violations alleged herein.

89. *First,* Defendant PAE knowingly and regularly submitted false and fraudulent claims for payment to the United States pursuant to its Government contracts, by instructing employees to falsely bill under specific time codes for work those same employees did not actually perform.

90. *Second*, Defendant PAE knowingly submitted false and fraudulent claims to the United States for the work performed that led to Mr. Ward's death despite the fact that it fell outside of scope of the contract's relevant provisions. Even if the dive itself could be interpreted to fall within the scope of the contract, it was performed by an undertrained, unqualified personnel—in direct contravention of the terms of the contract.

---

[69] *See* Notice of Settlement of All Claims Against All Parties, *Autumn Ward v. Pacific Architects & Engineers, LLC, et al.*, No. 3:21-cv-0305, ECF No. 82 (S.D. Cal. Aug. 4, 2023).

91. *Third,* and especially egregious in light of the tragedy involving Mr. Ward, PAE knowingly submitted false documentation to OSHA investigators during the process where OSHA was assessing penalties for violations related to Mr. Ward's death.

92. Taken individually and in their totality—the false billing, the evasion of OSHA fines, and the failure to uphold vital contract terms—PAE's fraudulent behavior caused the United States to make payments and fail to collect obligations to its detriment.

**1. Fraudulent billing to the U.S. Navy: PAE regularly facilitates falsified and improperly accounted for project billing under its Government contracts.**

93. As the Defense Contract Audit Agency has stated: "Timekeeping procedures and controls on labor charges are areas of utmost concern. Unlike other costs, labor is not supported by external documentation or physical evidence to provide an independent check or balance."

94. During the course of his employment, Relator learned that PAE engages in systemic time record falsification, which resulted in inflated billing under Government contracts. This fraudulent behavior was widely known amongst PAE employees.

95. Timekeeping at PAE involves a "billing code" or CLIN for each type of work being performed. During Relator's time at PAE, the company typically allocated a certain number of hours for a particular CLIN—e.g., a certain number of hours were allotted under the contract for maintenance, or for INLS courses, etc.

96. Billing codes for given projects were posted publicly by Matthew Rowley, who informed employees which codes to charge for the work they performed. Mr. Rowley posted codes every Monday on a white board in a common area.

97. Based on this public posting of billing codes, employees would choose the relevant billing codes for the activity they were engaging in during the week, and input the code into their timekeeping application. PAE employees billed these publicly-posted billing codes designated by Mr. Rowley *regardless of what projects they did or did not work on*. As stated by Relator under oath:[70]

> **Q. Let's go to timekeeping at PAE. How did you record your time?**
>
> A. So timekeeping is -- it's kind of comical. I say that in a sense because Matt Riley was an operation manager. He comes in and has a manifest list of who you are, what code you're going to use, and what that code is for. So when that code comes in, you just pretty much do what you have to do, whatever it says in the report.

98. Employees were generally aware of the practice of billing falsification. Fraudulent billing was widespread. Everyone knew and the practice became a running joke amongst employees who were instructed to falsely bill. Statements such as, "I wonder what we are going to charge this week," were openly made. According

[70] Deposition of Rogelio Estrella ("Estrella Dep."), *Autumn Ward v. Pacific Architects & Engineers, LLC, et al.*, No. 3:21-cv-0305, ECF No. 71-14, at 43 (S.D. Cal. Mar. 31, 2023) (spelling Rowley as Riley [sic]) (highlighting in original docketed copy of transcript).

to Relator, PAE employees would openly talk about how they were charging for a code that did not relate to their actual work.

99. Employees could be working on one type of project while being instructed to charge for another project.

100. Relator has provided several concrete examples of fraudulent billing practices.[71]

101. ***First,*** in October of 2019 or 2020, upon return to California from a work trip in Virginia for an Integrated Logistics Support course for the U.S. Navy, a team of PAE employees was instructed to continue to bill their time as though they were still in Virginia, using a charge code that was only used for offsite work. Physically offsite work generally possessed an "MTT" designation in the charge code. Relator recalls that the team was instructed to fraudulently bill their time with an MTT designation for approximately one to two weeks after returning to California. Relator also recalls a separate incident where he was instructed by PAE to use a billing code related to work in Baltimore; yet Relator had never worked in Baltimore.

102. ***Second,*** fraudulent billing increased during the COVID-19 pandemic, when PAE employees were instructed over several months to bill the Government for purported training services even when they *could not access and were not aboard the U.S. Navy craft they usually worked on.* During this business lull—which lasted months—Relator and his colleagues spent a significant amount of time at PAE

---

[71] *See also id.*

facilities, but not performing work for the Government. Specifically, during the early months of the pandemic, PAE employees remained idle for longer periods of time because active-duty military personnel were not attending classes. In addition, vessels normally used for operations, maintenance, and instruction were returned to the U.S. Navy. Nevertheless, Relator and his colleagues were instructed to bill under the broad "INLS Ops and Maint" code, even when they were effectively doing nothing. At the time, the U.S. Navy had reclaimed the vessels where PAE staff would have otherwise performed the work that was being claimed.

103. ***Third,*** on several occasions, Mr. Rowley informed PAE staff that they had "used up" a billing code, and instructed them to switch to another code while the same work was still ongoing. During several occasions, Mr. Rowley informed employees that he was "unable" to produce billing codes until later in the day. Employees suspected that this was because Mr. Rowley was buying time to assess how to charge an alternative code regardless of its accuracy.

104. ***Fourth,*** PAE's systemic fraudulent billing is further evidenced by the late Mr. Ward's time sheets. On the date of his death, *eight hours* of Mr. Ward's time was recorded under the charge description "CIMOTS COLDS – INLS Ops and Maint." This code ("INLS Ops and Maint") was often used as a "catch all" time code or CLIN that was broadly applied, and therefore easy to abuse.[72]

[72] *See* Michael Ward's Time Sheets, *Autumn Ward v. Pacific Architects & Engineers, LLC, et al.,* No. 3:21-cv-0305, ECF No. 70-9 (S.D. Cal. Mar. 31, 2023).

Employee: Ward, Michael
Employee ID:575452
Class:US-Hourly/NE FT OT -SCA
Printed: Feb 20, 2019 10:54:37 AM

**50 - USD Payroll Master**
**TC-040 Employee Timesheet**

Revisions: 2
Schedule: Weekly Standard PAE
Period Ending: Aug 26, 2018 (034)
Page: 1

| Line No | Project<br>Pay Type | Prem 2<br>Prem 3 | PLC | Charge Description | Mon<br>8/20 | Tue<br>8/21 | Wed<br>8/22 | Thu<br>8/23 | Fri<br>8/24 | Sat<br>8/25 | Sun<br>8/26 | Line Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 601093.04.FP00.00.001842.00<br>REG | | | CIMOTS COLDS - INLS Ops and Maint | 8.0 | 8.0 | 8.0 | | | | | 24.0 |
| 2 | 601093.04.FP00.00.001842.00<br>OTM | | | CIMOTS COLDS - INLS Ops and Maint | 2.0 | 2.0 | | | | | | 4.0 |
| **Regular**<br>**Overtime**<br>**Total** | | | | | **8.0**<br>**2.0**<br>**10.0** | **8.0**<br>**2.0**<br>**10.0** | **8.0**<br><br>**8.0** | | | | | **24.0**<br>**4.0**<br>**28.0** |

| | | |
|---|---|---|
| Signature: Dougherty, Patrick (504592)<br>Date: Aug 23, 2018 9:36:36 AM | Self-entry-I certify to the best knowledge and belief that all entries are correct & the time was expended on company business as recorded. TA-I certify to the best of my ability I have entered the timesheet as approved by the employee's supervisor. | Approval: White, Glen T. (504771)<br>Date: Aug 23, 2018 12:29:16 PM |

105. In testimony from Mr. Ward's wrongful death case, numerous PAE employees suggested that the dive Mr. Ward undertook that day was either too advanced, deep, and complicated to fall within the scope of PAE's Government contract, or too advanced and complicated for Mr. Ward himself. Despite this, it was recorded as being billable to the Government. Mr. Ward's timesheet falsely indicates that he worked for *eight hours* on the day of his death—an impossible reality given Mr. Ward's tragic demise.

106. It was not typical to engage in dives for lost equipment, and diving was not a part of the coursework PAE hosted for the Government. When PAE did dive, it was "maintenance"-related, i.e., for basic, shallow diving purposes such as underwater maintenance of the water craft and checking hulls,[73] i.e., dives that did not involve significant complexity.

[73] *See* Gunlock Dep. at 12; *see also* Deposition of Gary Gunlock 30(b)(6) ("Gunlock Dep. 30(b)(6)"), *Autumn Ward v. Pacific Architects & Engineers, LLC, et al.,* No. 3:21-cv-0305, ECF No. 75-9, at 12 (S.D. Cal. Apr. 28, 2023); Rowley Dep. I at 8; Williams Dep. at 32; Anaya Dep. at 29–30 ("they did minor diving jobs alongside the piers doing hull inspections on small boats").

* * *

107. Relator believes that in certain circumstances, PAE knowingly submitted inaccurate billing codes through invoices, thereby submitting false claims for payment to the Government.

108. The testimony of Michael Phillips, an instructor in PAE's Deck Department, taken in connection with the wrongful death action, corroborates Relator's allegations. Mr. Phillips began working at PAE in January of 2016, and knew Mr. Ward for approximately one decade—having served in the U.S. Navy with him prior to working at PAE.[74] Mr. Phillips previously worked for the U.S. Navy for 20 years.[75]

109. Mr. Phillips confirmed that fraudulent billing was "common" at PAE, and that he was personally directed by Mr. Rowley to record time on a job he did not perform approximately "a few times a year:"[76]

---

[74] *See* Phillips Dep. I at 5, 7.

[75] *See id.* at 5–6.

[76] *See id.* at 30; *see also id.* at 29–31 (describing being asked to record time on jobs he did not perform).

> Q. Is that a common practice at PAE to bill to jobs that you didn't actually work on?
>
> MR. OU: Objection. Calls for speculation, lacks foundation.
>
> THE WITNESS: Since I've been there.

110. In other words, PAE knowingly engaged in a widespread pattern of defrauding the United States by manipulating and abusing billing codes under its contracts. By doing so, PAE maximized its profit at the expense of the United States, billing for services not rendered and / or at rates not commensurate with work actually rendered.

**2. Fraudulent billing in connection with the work that led to Mr. Ward's death**

111. On information and belief, PAE reportedly billed the Navy for the work performed that led to Mr. Ward's death even though it (1) fell outside of scope of the contract's relevant provisions, and (2) even if the dive could be interpreted to fall within the scope of the contract, was performed by an undertrained, unqualified personnel—in direct contravention of the terms of the contract.

112. In addition, as mentioned above, Mr. Ward could not have completed eight hours of work on the day of his death.

113. Both Relator's statements as well as deposition testimony from the wrongful death litigation suggests that: (1) a dive falling outside of PAE's capabilities and general duties would not fall under the scope of its contract with the United States; (2) the dive was not encompassed in the applicable provisions of the Statement

of Work; (3) even if the dive somehow fell within the scope of the contract, the job that led to Mr. Ward's death was not compliant with the Statement of Work because he was not properly qualified to do the dive; and (4) PAE terminated its "voluntary" dive program after the incident.

114. There are only two provisions in PAE's Statement of Work that reference diving:

> – "OM-5.3.2 Intermediate "I" Level Maintenance. This level of maintenance normally consists of calibration, repair, or replacement of damaged or unserviceable parts, components or assemblies. This includes preventive and corrective maintenance performed primarily on spare assemblies or other components requiring special tools or test equipment. Contractor shall maintain qualified on-site diving team in order to conduct underwater inspection of Powered and Non-Powered Sections."[77]
>
> – "OM-7.1.3 Single Anchor Leg Moor (SALM). The Contractor shall provide qualified personnel to operate the SALM. Contractor snorkel and SCUBA diving is required to prepare the SALM for training operation and return SALM to post-training status."[78]

115. Numerous individuals in the wrongful death litigation suggested in their testimony that the August 22, 2018 dive resulting in Mr. Ward's death did not fall under either Statement of Work provision.[79]

---

[77] Statement of Work at 47 (emphasis omitted).

[78] *Id.* at 48–49 (emphasis omitted).

[79] *See, e.g.*, White Dep. II at 17–18; *see* Deposition of Matthew Rowley ("Rowley Dep. II"), *Autumn Ward v. Pacific Architects & Engineers, LLC, et al.*, No. 3:21-cv-0305, ECF No. 76-16, at 4–5 (S.D. Cal. Apr. 28, 2023); Rowley Dep. I at 29–31; Williams Dep. at 32–34; Cagle Dep. at 27–28; Anaya Dep. at 29, 33–35; Casey Dep. at 5–9.

116. Further testimony suggests that the decision to mark the rode line was an internal decision, and not motivated by a request or expectation of the Navy.[80] Moreover, numerous replacement rode lines existed and could have been used—making the endeavor unnecessary:[81]

> **Q. Are you aware whether there were replacement rode lines available to be used for the floating causeway?**
>
> A. When I was the bosun there, there were 16 extras. I don't know if there was when I was at EWTGPAC.
>
> **Q. After the rode line was lost, PAE could have just purchased another rode line too, correct?**
>
> MR. OU: Objection. Calls for speculation. Lacks foundation. Incomplete hypothetical.
>
> THE DEPONENT: They could have, absolutely, if they thought that the juice wasn't worth the squeeze.

117. Even if the dive undertaken on the day of Mr. Ward's death could plausibly be interpreted to fall within the scope of PAE's contracts, the Statement of Work unequivocally provides that PAE "shall be responsible for providing competent, *qualified personnel* necessary to perform its responsibilities hereunder, and as further described hereafter."[82] As stated by an expert witness in the wrongful death

[80] *See* Anaya Dep. at 25–27.

[81] Kamins Dep. at 51.

[82] *See* Statement of Work at 26 (emphasis added).

litigation, the dive Mr. Ward undertook was a salvage dive for which Mr. Ward was not properly certified.[83] Mr. Ward was not trained as a commercial diver. PAE was aware that he was not fully trained,[84] but directed him to do the dive anyway, thereby breaching its obligation to provide competent and qualified personnel to perform work under the contract.

118. In addition to expert testimony, deposition testimony confirms that Mr. Ward was not significantly trained in diving,[85] and that PAE employees "were pretty desperate" to add another diver to their team.[86] Other deposition testimony confirms that Mr. Ward looked scared before the dive.[87]

119. Yet more evidence suggests that PAE leadership was questioned by an employee about their decision to mark the rode line, and to employ Mr. Ward to do so:[88]

---

[83] *See* Report of George Lulham ("Lulham Report"), *Autumn Ward v. Pacific Architects & Engineers, LLC, et al.*, No. 3:21-cv-0305, ECF No. 71-6, at 2–3 (S.D. Cal. Mar. 31, 2023)

[84] *See, e.g.*, White Dep. II at 53–55.

[85] *See, e.g.*, Deposition of Stephen Sako ("Sako Dep."), *Autumn Ward v. Pacific Architects & Engineers, LLC, et al.*, No. 3:21-cv-0305, ECF No. 71-21, at 22–23 (S.D. Cal. Mar. 31, 2023).

[86] *See* Anaya Dep. at 28.

[87] *See, e.g.*, Casey Dep. at 40.

[88] *See* Casey Dep. at 55–56; *see also* Daniel Casey Text Message, *Autumn Ward v. Pacific Architects & Engineers, LLC, et al.*, No. 3:21-cv-0305, ECF No. 71-33 (S.D. Cal. Mar. 31, 2023) (sending text message that read: "I'm questioning the leadership of this company that put 1 inexperienced diver solo in the water for a salvage dive.

> **Q. What were the questions that you had?**
>
> A. What the hell were we doing? You know, why were we recovering a roadway chain that costs $2,000? Why didn't we have another diver? Litany of questions and answers. Why did we do this? Who authorized it?

120. Deposition testimony further suggests that employees at PAE may have been made to dive so that others could benefit from increased hazard pay—further creating incentive to place unqualified divers in the water.[89]

121. Under the FAR, costs are only allowable when they comply with the "[t]erms of the contract," e.g., the qualified personnel requirement. FAR § 31.201-2(a). Among other things, PAE was required by the contract to meet basic standards around safety, security, and work conditions.[90]

122. Due to Mr. Ward's death during the dive and after investigating the matter, OSHA recommended fines "for not providing commercial diving training to

---

I'm wondering why we lost a young man for a senseless piece of equipment that should have never been lost.") (highlighting in original docketed copy of transcript).

[89] *See* Anaya Dep. at 9.

[90] *See* Statement of Work at 25.

the dive team,"[91] and because "[e]ach dive team member did not have the experience or training necessary to perform assigned tasks in a safe and healthful manner."[92]

123. Mr. Sako and Mr. Dingman both testified under oath in the wrongful death litigation that PAE's limited dive work prior to the incident consisted almost entirely of basic hull and vessel inspections and fixes (i.e., "maintenance"-related dives) at shallow depths from the piers.[93]

124. Prior to the discontinuance of the program, Mr. Sako testified that he only dove four or five times per year for PAE.[94] As with all other divers, diving was separate from Mr. Sako's normal job duties—diving was a collateral, as opposed to a primary duty.

125. The dive Mr. Ward undertook was at a much greater depth than any maintenance dive typically performed at PAE.

---

[91] OSHA Investigative Report ("OSHA Report"), *Autumn Ward v. Pacific Architects & Engineers, LLC, et al.*, No. 3:21-cv-0305, ECF No. 71-4, at 25 (S.D. Cal. Mar. 31, 2023).

[92] *Id.* at 32.

[93] *See, e.g.*, Deposition of Alan Dingman ("Dingman Dep."), *Autumn Ward v. Pacific Architects & Engineers, LLC, et al.*, No. 3:21-cv-0305, ECF No. 71-13, at 10, 16 (S.D. Cal. Mar. 31, 2023) ("Almost 100% of [dive work at PAE] was maintenance."); Sako Dep. at 6–7; *see also* Casey Dep. at 3–4, 20.

[94] Sako Dep. at 7.

126. Despite this, the dive was billed to the Government as INLS Operations and Maintenance.[95] The Government approved and paid the invoice.[96]

127. The failure to provide qualified personnel under a contract was material to the United States. No contracting party (and certainly no government entity) would pay contractors for personnel they cannot rely on to do the work because they are unqualified.

### 3. Fraudulent submissions to OSHA: PAE falsified training records supplied during OSHA's investigation of Mr. Ward's death in order to reduce penalties.

128. The goals of workplace safety and protecting employees from serious injury underpin our most bedrock labor laws. Under Section 5 of the Occupational Safety and Health Act of 1970 (the "OSH Act"), employers must provide employees "employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death." 29 U.S.C. § 654. When OSHA investigates workplace incidents such as death, and where the employer receives a citation for a "serious violation" of Section 5's requirement, a civil penalty "*shall* be assessed." 29 U.S.C. § 654(b) (emphasis added).

129. It is a violation of the False Claims Act to avoid obligatory fines owed to the Government such as those that would have been owed by PAE. Specifically, it is

---

[95] *See* August 2018 Invoice to Government ("2018 Invoice"), *Autumn Ward v. Pacific Architects & Engineers, LLC, et al.*, No. 3:21-cv-0305, ECF No. 70-10 (S.D. Cal. Mar. 31, 2023).

[96] *See* Gunlock Decl. at 6.

a violation to "knowingly conceal[] or knowingly and improperly avoid[] or decrease[] an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

130. OSHA issued "serious violation" citations to PAE in connection with Mr. Ward's death—the type that warrant civil penalties. PAE, because of its violations, had an existing obligation to pay the U.S. Government. Yet as described below, PAE and its employees fraudulently undermined OSHA's investigation into Mr. Ward's death by submitting false training records in order to reduce the severity of assessment that would result from OSHA's investigation.

131. OSHA's fines were ultimately reduced from its original assessment.

132. Mr. Ward died in August of 2018 while on a dive at PAE's direction to mark a lost "rode line" (essentially, a large piece of rope or chain) located at the bottom of the Pacific Ocean.

133. Present on the fatal dive were dive supervisor Stephen Sako, secondary diver Alan Dingman, and boat operator Dan Casey. Mr. Sako and Mr. Dingman were in charge of Mr. Ward's dive. The boat (or "vessel") used the day Mr. Ward died was owned by the U.S. Navy.[97]

[97] *See* Ans. to Compl., *Autumn Ward v. Pacific Architects & Engineers, LLC, et al.*, No. 3:21-cv-0305, ECF No. 8, at 4 (S.D. Cal. Apr. 12, 2021).

134. Mr. Ward was not adequately trained as a commercial diver, a fact that PAE, and Messrs. Sako and Dingman, were aware of.[98] Prior to the day of his death, Mr. Ward had only carried out approximately two training dives for PAE, both in shallower water.[99]

135. The day before his death, Mr. Ward further confided his fear of the planned upcoming dive in deeper water to Relator and Mr. Phillips, expressing trepidation that the dive with PAE could kill him:[100]

> this is how I knew he was scared because he made a comment saying, "I don't want these motherfuckers to kill me." That drew concern. It was a red flag for me.

136. Relator and Mr. Phillips sought to convey this fear to Mr. Dingman prior to Mr. Ward's dive—accompanying Mr. Ward to speak to Mr. Dingman directly about

---

[98] *See, e.g.*, Lulham Report at 2–3; OSHA Report at 11 (including notes from an interview with a PAE employee, mentioning that someone informed them that Mr. Ward was a recreational diver, and that the day of his death was "[m]aybe [his] first commercial diving job").

[99] *See* OSHA Report at 5.

[100] Estrella Dep. at 10 (discussing conversations regarding the planned dive with Mr. Ward the day prior to his death); *see also* Phillips Dep. I at 15 (confirming same trepidation over diving in deeper water and same statement on the part of Mr. Ward: "I don't want these motherfuckers to kill me").

his concern.[101] Mr. Dingman gave both Relator and Mr. Phillips the impression that Mr. Ward would not be alone in the water.[102]

137. The dive nonetheless went forward with Mr. Ward solo in the water, without a buddy diver[103] as would have been best practice and in accordance with PAE's own dive manual, and without being line-tended to the vessel.[104]

138. After Mr. Ward's death, OSHA conducted an investigation into PAE. In a report detailing its findings, OSHA found numerous "serious" violations that occurred in relation to Mr. Ward's death, including a failure to bring certain equipment to the dive location; the fact that Mr. Ward was undertrained; and a failure to provide a means of assisting a diver from the water.[105]

---

[101] *See, e.g.*, Phillips Dep. I at 15.

[102] *See* Estrella Dep. at 16–17; Phillips Dep. I at 16, 18.

[103] Per the U.S. Navy Diving Manual, buddy divers are "[d]ive partners operating in pairs [who] are jointly responsible for the assigned task and each other's safety. … The basic rules for buddy diving are … [to] [a]lways maintain contact with the dive partner[,] [n]ever leave a partner unless the partner has become trapped or entangled and cannot be freed without additional assistance[, and] [i]f partner contact is broken, follow the established lost-diver plan." *See U.S. Navy Diving Manual Revision 7*, at 7-5, Direction of Commander, Naval Sea Systems Command, updated Apr. 30, 2018, *available at* https://www.navsea.navy.mil/Portals/103/Documents/SUPSALV/Diving/US%20DIVING%20MANUAL_REV7_ChangeA-6.6.18.pdf?ver=2018-06-15-102549-030 (last visited Dec. 20, 2023). Buddy diving is "the single greatest safety practice in Navy SCUBA operations." *Id.*

[104] *See* Lulham Report at 4–5.

[105] *See* OSHA Report at 32–37.

139. OSHA's ultimate conclusion was to issue penalties to PAE for a lack of proper dive training and protocol:

> Citations were recommended for not providing commercial diving training to the dive team, not having a method to remove an injured worker from the water, not having the diver line-tended at the time of operations, not having a bag-type manual resuscitator mask, and for an ineffective diving operations program.[106]

140. More specifically, PAE was cited for multiple "serious" violations—for example, a proposed penalty of $13,260 because "[e]ach dive team member did not have the experience or training necessary to perform assigned tasks in a safe and healthful manner."[107]

141. In total, OSHA proposed penalties of $66,300 for serious violations.[108] PAE and the Department of Labor (i.e., OSHA) ultimately settled for half the proposed penalties for a total fine of $33,150.[109]

142. Multiple individuals have knowledge of falsifications made in order to thwart OSHA's investigation of Mr. Ward's death, and to reduce penalties from OSHA's citations.

---

[106] *Id.* at 25, 32.

[107] *Id.* at 32.

[108] *Id.* at 39.

[109] *See id.* at 50.

143. Following Mr. Ward's death, Mr. Dingman informed Relator that certain documents were falsified and submitted during the OSHA investigation.[110] Specifically, in multiple conversations, Mr. Dingman divulged to Relator that Mr. Dingman himself, as well as Mr. Sako, Mr. Rowley (Operations Manager), and Gary Gunlock (Program Manager) fabricated (and/or validated through adding their signature to specific forms) trainings that were never actually held. They presented those "trainings" to OSHA during its investigation. When Relator asked Mr. Dingman if he was concerned about being found out and punished for this fraud, Mr. Dingman replied that it was "all Steve Sako's idea." Relator spoke with Mr. Dingman about this topic on multiple occasions.

144. Specifically, Mr. Dingman had informed Relator that OSHA requested three years' worth of documentation for dive operation trainings, "and that they had falsified … training reports to submit to OSHA."[111] Steve Sako "made these trainings," while others signed off on the fabricated trainings.[112]

145. Relator testified as to this fraud under oath during a deposition taken for the wrongful death action:[113]

---

[110] *See* S. Rep. No. 99-345, at 18 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5283 ("[A]n individual who makes a material misrepresentation to avoid paying money owed the Government would be equally liable under the Act as if he had submitted a false claim.").

[111] *See* Estrella Dep. at 38–39.

[112] *See id.* at 39.

[113] *See id.* at 38.

> could dive again because of the incident. And that's when he divulged to me that I guess OSHA was asking for some training reports. They document every three years, and that they had falsified those training reports to submit to OSHA.
>
> And I remember looking at him like, Aren't you scared of getting caught? He was kind of like no, not really. And I was dumbfounded about the accusation that he was making.

146. Over time, multiple PAE employees separately learned about the falsification from Mr. Dingman and "[a]s time went on it became more of shoptalk. So people were aware this happened."[114] PAE employees that eventually knew of the falsification included Lifa Faatiliga, Michael Phillips, Thomas Smith, Denise Brown, William Crowell, and Kevin Williams.[115] This list of individuals includes high-level managers with supervisory authority, who did not do anything with the information:[116]

[114] *See id.* at 42.

[115] *See id.* at 41–42; *see also* Phillips Dep. I at 19 (describing Mr. Dingman stating he had a moral issue with certain records to Mr. Phillips, and relaying his impression from Mr. Dingman that records or paperwork were falsified).

[116] *See* Estrella Dep. at 43.

> We're talking about in the rank structure. The fact that these senior leaders, who are more senior than me, wouldn't do nothing with the information, it was kind of like off-putting.

147. Relator believes that these falsified documents would have been material and integral to OSHA's assessment of penalties and the reduction of penalties that occurred.

148. OSHA's investigative report of the incident indeed specifically made note of PAE's diving and training records[117]—i.e., training records that had been fabricated.

149. The report indicates a reliance on PAE employees' narrative of events, and, for example, quotes a PAE employee as stating that "[a] safety brief was conducted prior to getting underway by Steve Sako all safety and operational objectives were thoroughly explained."[118]

150. The report further quotes another employee as stating that Mr. Ward "was briefed" prior to his dive, and that "[a]ll Pre-Dive safety briefs and checks were complete prior to leaving the site, and a project task brief was conducted on the boat prior to diving."[119]

---

[117] *See* OSHA Report at 1.

[118] *Id.* at 23.

[119] *Id.* at 24.

151. Notably, OSHA ultimately settled for half the originally proposed penalties after reviewing the fabricated training reports and fabricated "facts."

## CAUSES OF ACTION

### COUNT I – Violation of 31 U.S.C. § 3729(a)(1)(A) (Presentation of False Claims for Payment)

152. Relator repeats and re-alleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

153. This a claim for treble damages and penalties under the FCA.

154. The FCA, 31 U.S.C. § 3729(a)(1)(A), imposes liability upon those who knowingly present or cause to be presented false claims for payment or approval.

155. Through the acts described above and otherwise, Defendant PAE, by and through its officers, agents, supervisors, and employees, knowingly presented or caused to be presented to the United States Government false claims for payment or approval, including under Government contracts N61340-14-D-0001 and N61340-19-D-1020.

156. Defendant PAE certified that it would comply with its obligations under the above contracts.

157. Each of the false or fraudulent claims submitted, or caused to be submitted, by Defendant is a separate violation of 31 U.S.C. § 3729(a)(1)(A).

158. The United States was unaware of the false or fraudulent nature of the claims Defendant submitted or caused to be submitted.

159. The false or fraudulent claims Defendant knowingly submitted or caused to be submitted to the United States were material to the decisions of the United States to pay for the services purportedly rendered under PAE's contracts.

160. Had the United States actually known of the false or fraudulent nature of the claims, it would not have made the corresponding payments.

161. Because of these false or fraudulent claims that Defendant submitted or caused to be submitted, the United States has been damaged in an amount to be determined at trial.

**COUNT II – Violation of 31 U.S.C. § 3729(a)(1)(B)**
**(Use of False Statements Material to False Claims)**

162. Relator repeats and re-alleges the preceding paragraphs as if fully set forth herein.

163. This is a claim for treble damages and penalties under the FCA.

164. The FCA, 31 U.S.C. § 3729(a)(1)(B), imposes liability upon those who knowingly make, use, or cause to be made or used false records or statements material to a false or fraudulent claim.

165. Through the acts described above and otherwise, Defendant PAE, by and through its officers, agents, supervisors, and employees, knowingly made, used, or caused to be made or used false records or statements material to the payment of false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

166. Had the United States actually known of the false nature of Defendant's representations, it would not have made the corresponding payments.

167. Because of these false records or statements, the United States paid claims, resulting in damages to the United States in an amount to be determined at trial.

**COUNT III – Violation of 31 U.S.C. § 3729(a)(1)(C)**
**(Conspiracy)**

168. Relator repeats and re-alleges the preceding paragraphs as if fully set forth herein.

169. This is a claim for treble damages and penalties under the FCA.

170. The FCA, 31 U.S.C. § 3729(a)(1)(C), imposes liability upon those who conspire to commit a violation of another sub-section of the FCA.

171. Defendant knowingly, in reckless disregard, and/or in deliberate ignorance of the truth conspired with its employees and administrators, and others, to violate the FCA in the manner set forth above.

172. Because of these false records or statements, the United States paid claims, resulting in damages to the United States in an amount to be determined at trial.

**COUNT IV – Violation of 31 U.S.C. § 3729(a)(1)(G)**
**(Avoiding or Decreasing Obligations)**

173. Relator repeats and re-alleges the preceding paragraphs as if fully set forth herein.

174. The FCA, 31 U.S.C. § 3729(a)(1)(G), imposes liability upon those who knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the United States;

or knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money to the United States.

175. Through the acts described above and otherwise, Defendant PAE, by and through its officers, agents, supervisors, and employees, knowingly made, used, or caused to be made or used false records or statements material to obligations it owed to the Government as a penalty for its violations of OSHA regulations.

176. Further, Defendant PAE, by and through its officers, agents, supervisors, and employees, knowingly concealed and/or knowingly and improperly avoided or decreased an obligation to pay the United States by falsifying documents submitted to OSHA to reduce mandatory penalties owed to the United States.

177. Because of these acts, the United States failed to collect monies it was otherwise entitled to, resulting in damages to the United States in an amount to be determined at trial.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff–Relator demands and requests that judgment be entered against Defendant as to the claims as follows:

i. ordering that Defendant cease and desist from violating the FCA;

ii. directing that Defendant pay an amount equal to three times the amount of damages the United States has sustained because of such Defendant's actions;

iii. directing that Defendant, pursuant to the FCA, pay penalties of not less than $13,508 and not more than $27,018 for violation of the FCA;

iv. granting Plaintiff–Relator the maximum amount allowed under 31 U.S.C. § 3729 and / or any other applicable provision of law;

v. directing that Defendant pay Plaintiff–Relator's fees and costs, including attorneys' fees, as provided by the FCA;

vi. directing that Defendant pay interest on all sums ordered paid;

vii. ordering that Plaintiff–Relator recovers such other relief as the Court deems just and proper; and

viii. granting such other and further relief as the Court deems just and proper.

**REQUEST FOR TRIAL BY JURY**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby requests a trial by jury.

Dated: February 9, 2024

DELEEUW LAW LLC

*<u>/s/ P. Bradford deLeeuw</u>*
P. Bradford deLeeuw (DE #3569)
1301 Walnut Green Road
Wilmington, DE 19807
(302) 274-2180
(302) 351-6905 (fax)
brad@deleeuwlaw.com

OF COUNSEL:

Adam Pollock
Alison Borochoff-Porte
111 Broadway, Suite 1804
New York, NY 10006
(212) 337-5361
Adam@PollockCohen.com
Alison@PollockCohen.com

*Attorneys for Plaintiff/Relator*